J. P. Hassey, Appellant, v. A. C. Allyn and Company, Appellee.

Gen. No. 41,199.

38

Opinion filed June 19, 1940.

Simon T. Sutton and McNab, Holmes & Long, all of Chicago, for appellant; Simon T. Sutton and Wallace B. Kemp, of Chicago, of counsel.

Robertson & Spence, of Chicago, for appellee; Egbert Robertson and Henry L. McIntyre, both of Chicago, of counsel.

Mr. Justice Burke delivered the opinion of the court.

On January 25, 1938, plaintiff filed a statement of claim in the municipal court of Chicago and therein alleged that on July 8, 1929, and for some time prior thereto, he was employed by Roberts & Oake, Inc.; that defendant solicited him to purchase 1,085 shares, without par value, of the common stock of Roberts & Company, a corporation, at the price of $3 per share; that in consideration of such purchase the defendant then

and there agreed orally with plaintiff that if at any time his employment with said Roberts & Oake, Inc. was discontinued, defendant would on demand repurchase said stock at the price which plaintiff paid defendant for it; that pursuant to the agreement, plaintiff purchased 1,085 shares of said common stock from defendant and paid the sum of $3,255; that he received certificate No. 100 dated July 8, 1929, covering the stock so purchased by him; that he is now the legal holder and owner of said certificate and the stock thereby covered; that he remained in the employ of Roberts & Oake, Inc. continuously until September 25, 1937, when his employment was discontinued; that he thereupon demanded that defendant repurchase the stock at the price paid by him; that defendant failed and neglected so to do, and that plaintiff was entitled to recover the sum of $3,255. It its defense defendant admitted the employment of plaintiff by Roberts & Oake, Inc., and that he remained in such employment until September 25, 1937, when his employment terminated; that plaintiff was the legal holder and owner of certificate No. 100 for 1,085 shares of stock; that plaintiff demanded that defendant repurchase his stock and that defendant refused to repurchase the stock. Defendant denies all the other allegations of the amended statement of claim. Defendant further alleged that if any agent of the defendant undertook to make such oral agreement as plaintiff alleged, such purported agreement was wholly beyond the scope of the authority of such agent, and beyond the corporate powers of the defendant, and that defendant was in no way bound thereby; that if any agent made such agreement, it was wholly without consideration. The defense further stated that if any agent of the defendant undertook to make such oral agreement, it came within the provisions of section 1 of the statute relating to frauds and perjuries (sec. 1, ch. 59, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 55.01]) and was wholly invalid; that the alleged contract was

unenforcible by action because it came within the provisions of section 4 of the Uniform Sales Act (sec. 4, ch. 121½, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 121.08]) ; that the value of the stock is $500 and upwards and that no part thereof was accepted or received by defendant, or anything given in earnest by either party to bind the contract. The case was tried before the court and a jury. At the close of all the evidence, the court, on motion of defendant, instructed the jury to find the issues for the defendant, which was done. The court entered judgment on the verdict. Plaintiff moved for a new trial, which the court overruled. This appeal followed.

Plaintiff's theory of the case is that the contract is valid and enforcible and is based upon a valuable consideration and was entered into by the defendant through its duly authorized agent; that defendant was bound to purchase the stock of plaintiff after September 25, 1937, when plaintiff's employment with Roberts & Oake, Inc. terminated, and the plaintiff demanded that defendant purchase the stock; that defendant's refusal to purchase the stock was a breach of contract for which the plaintiff is entitled to recover damages. Defendant's theory of the case is (1) defendant did not sell any stock of Roberts & Company to the plaintiff; (2) No one made any agreement in behalf of defendant to purchase or repurchase any such stock from plaintiff; (3) Even if E. W. Thomas had made such an agreement on behalf of the defendant he was without authority so to bind the defendant; (4) Even if E. W. Thomas had made such an agreement and had been so authorized, such agreement was without consideration; and (5) Even if E. W. Thomas had made such an agreement and had been so authorized, such agreement is unenforcible under the statute of frauds.

The first point presented by plaintiff is that it is error for the trial court to give a peremptory instruction to find the issues for the defendant where there is

any evidence in favor of the plaintiff, which, with all the inferences that a jury may justifiably draw therefrom, fairly tends to prove the cause of action set out in the statement of claim. Under this point plaintiff argues that there is some evidence which fairly tends to prove the plaintiff's cause of action. Defendant concedes that upon a motion to direct a verdict for the defendant the court is not permitted to weigh the evidence, or to base its decision on such motion upon a consideration of the credibility of the witnesses. Defendant also calls attention to the rule that since the presumptions are in favor of the action of the trial court, the burden is upon the plaintiff to point out the evidence which might reasonably in the eye of the law constitute support for a verdict of the jury in favor of the plaintiff, if one should be rendered. Defendant cites *Libby, McNeill & Libby v. Cook,* 222 Ill. 206, for the proposition that where there is no affirmative defense, the rule is that a verdict for the defendant should not be directed when there is in the record evidence which fairly tends to prove all the material averments of the declaration; that a mere scintilla of evidence in favor of the plaintiff does not justify the court in refusing to direct a verdict, because that *quantum* of evidence, only, cannot be said to fairly tend to prove any material averment of the declaration. Defendant also calls our attention to the statement in *Brandt v. Brandt,* 286 Ill. App. 151, that the ultimate question to be decided upon such a motion is whether there is any evidence in the record from which a jury could, acting reasonably in the eye of the law, return a verdict for plaintiff. If there is such evidence, the motion should be denied; if not, then the motion should be granted. Plaintiff does not challenge the statement of law by defendant that it is incumbent upon him to show that there was presented in support of the claim, a promise made in behalf of the defendant, or a *quantum* of evidence from which the jury might reasonably in the

eye of the law, have found for plaintiff. Defendant then states another principle of law governing the directing of a verdict where the defendant presents an affirmative defense. That principle is that where evidence of an affirmative defense is offered, it is proper to direct a verdict for the defendant even though all the averments of the statement of claim are proved, if the evidence of the affirmative defense is not contradicted or questioned. If the defendant introduces uncontradicted evidence of facts, consistent with every fact which the evidence of plaintiff tends to prove, but showing affirmatively a complete defense, the motion for a directed verdict made at the close of all the evidence should be allowed. (*Nelson v. Stutz Chicago Factory Branch,* 341 Ill. 387; *Cohen v. New York Life Ins. Co.,* 256 Ill. App. 345; *Paulsen v. Cochfield,* 278 Ill. App. 596.) Defendant contends that the rule as to the directing of a verdict where the defendant produces uncontradicted evidence of an affirmative defense, is applicable to its defenses of want of authority, want of consideration, statute of frauds and to a peculiar situation which plaintiff asserts is raised by the testimony as to the alleged promise. Defendant argues that plaintiff failed to produce the requisite *quantum* of evidence that a promise was made in behalf of defendant, and that the testimony of the witnesses is consistent with the fact that the promise was made in behalf of Roberts & Oake, Inc. In granting the motion for a directed verdict the trial court decided as a matter of law that the plaintiff had failed to present a *quantum* of evidence sustaining his claim, or had failed to present any evidence to contradict the undisputed affirmative defense presented by defendant. It has been necessary, therefore, to carefully read the transcript of testimony in order to apply the aforesaid principles of law. In considering the testimony, we have in mind the admonition that we should not weigh the testimony. The parties are in substantial agreement as to the principles of law gov-

erning the consideration of the propriety of a directed verdict.

Early in 1929, Roberts & Oake Co., Miller & Hart and Roberts & Withington were packing house companies, in which the principal stockholders were Col. John Roberts and his brother, C. J. Roberts. That year Roberts & Oake Co. became Roberts & Oake, Inc., a Delaware corporation. With the aid of A. C. Allyn & Company, an investment banking house, a plan was devised under which the entire common stock of the operating companies was acquired by a new holding company called Roberts & Company. The plaintiff and other employees of Roberts & Oake, Inc., had formerly held preference and common stock of the old Roberts & Company, and as a part of the corporate rearrangement this stock had been surrendered and paid for. Out of these transactions C. J. Roberts received 73,157 shares of the common stock of Roberts & Company, of which A. C. Allyn & Company agreed to purchase a substantial part less such of the stock as Roberts might dispose of to members of the organization of the operating companies. C. J. Roberts received certificate No. 16 for 68,157 shares in Roberts & Company. John Roberts received certificate No. 72 for 113,265 shares of Roberts & Company. These two certificates were surrendered for cancellation, and out of the shares represented, there were issued the following certificates: Certificate No. 83 to A. C. Allyn & Company for 60,000 shares, certificate No. 127 to C. J. Roberts for 45,557 shares, and certificate No. 128 for 75,865 shares to John Roberts. On the same day, July 8, 1929, certificate No. 83 for 60,000 shares to A. C. Allyn & Company was surrendered for cancellation and reissue of the stock represented thereby, and out of such shares the following certificates were issued: Certificate No. 100 to J. P. Hassey, plaintiff, for 1,085 shares, and other certificates to 39 employees of Roberts & Oake, Inc., aggregating with certificate No. 100 a total of 11,000 shares, and certificate

No. 126 to A. C. Allyn & Company for 49,000 shares. As a result of the meeting of the keymen of Roberts & Oake, on or about June 10, 1929, 39 employees of Roberts & Oake undertook to purchase stock of Roberts & Company in varying amounts totaling 11,000 shares. At this time the books of Roberts & Company were kept at the office of A. C. Allyn & Company. Defendant contends that the nature of the transactions was to transfer 11,000 of the shares owned by C. J. Roberts to 39 employees of Roberts & Oake, among whom was J. P. Hassey, the plaintiff, and that the passage of said shares through the name of A. C. Allyn & Company was simply a matter of bookkeeping convenience as to the issuing and indorsing of the certificates. The meeting at which plaintiff contends the oral agreement to repurchase was made, was on June 10, 1929, in the offices of Roberts & Oake, Inc. There were present C. J. Roberts, plaintiff, Howland, Costello, Long and Dunnett, all officers and directors of Roberts & Oake, Inc. Among the employees present were Mr. Hood, chief engineer, Mr. Turner, the hog buyer, Mr. Zipperer, in charge of sausage manufacturing, Mr. Kent, in charge of killing, Mr. Burgess, in charge of the sellers, and Mr. Rose the purchasing agent. A. C. Allyn, president of defendant corporation, was not present. E. W. Thomas was also present at the meeting. At that time he was a director and vice president of the defendant corporation and a vice president of Roberts & Oake, Inc., and Roberts & Company. Mr. Thomas addressed the meeting and informed them of the reorganization which had taken place in the corporate structure of Roberts & Oake, Inc. The employees were told there would be no change in the management of the company, and the organization and nature of Roberts & Company was described. There is no dispute about the fact that at the meeting of directors, officers and employees of Roberts & Oake, Inc., E. W. Thomas stated to such employees that those who purchased the stock of Roberts & Company under the

opportunity then given them, would, in the event they ceased to be employees of Roberts & Oake, Inc., or died, have the stock taken off their hands, or from their estates, at the price they were paying, $3 a share, provided a public market had not been made for the stock. It is likewise undisputed that the minutes of the regular meeting of the board of directors of Roberts & Oake, Inc., held June 13, 1933, show the following:

"One of our salesmen left the employ of our company and question arose as to whether we should repurchase the Roberts & Company stock from him at the price he paid for his original subscription. In accordance with agreement made at the time the stock was purchased the Board instructed the repurchase of this salesman's stock." It is also admitted that plaintiff, J. P. Hassey, was one of the board of directors which took this action. Mr. Thomas testified that at the meeting with the keymen the promise to repurchase was made specifically in behalf of Roberts & Oake, Inc. It is the contention of defendant that it is now incumbent upon the plaintiff to point out the evidence in the record from which the jury might reasonably in the eye of the law, be entitled to draw a legitimate inference that the promise was made in behalf of A. C. Allyn & Company and not in behalf of Roberts & Oake, Inc. In their testimony as to the conversation on which plaintiff relies, the witnesses frequently indulged in the use of pronouns, and a dispute has arisen as to whether the parties, in the use of the pronouns, were referring to a promise to repurchase in behalf of defendants, A. C. Allyn & Company, or in behalf of Roberts & Oake, Inc., the employer of plaintiff. Defendant contends that the court was fully warranted in concluding that there was no adequate *quantum* of evidence to support plaintiff's claim that the promise was made on behalf of the defendant. It, therefore, becomes necessary for us to briefly summarize the testimony of the witnesses in order to determine whether or not the court usurped the province

of the jury in directing a verdict in so far as the controversy as to the promise is concerned. In considering this testimony, it should be borne in mind that plaintiff is entitled to have the evidence considered in the light most favorable to him, with all reasonable inferences that may be drawn therefrom. We have no right to weigh the evidence.

Arthur C. Allyn, who was called as a witness for plaintiff under rule 195-A, section 33, of the municipal court, testified that he was president of the defendant corporation; that the business of defendant was buying and selling bonds and stocks and included the buying and selling of securities or stocks of corporations whenever the defendant underwrote and sold to the public; that E. W. Thomas was vice president; that Thomas was primarily assistant to witness; that "As my assistant he attended to the details of the effectuation of the plans made, generally speaking, if I were not present. We all sold securities. I was to initiate it. I very often did a great deal with setting it up in the first instance, making the plan, then I turned it over to some one to finish the execution of those plans; and that was the nature, generally, of Mr. Thomas' work. He was helping to originate securities. He was generally as useful as he could be throughout the organization.

"In connection with the setting up of Roberts & Company, I consulted many times with Mr. Thomas. I remember the transaction. I initiated the purchase of both Miller & Hart and Roberts & Oake from Colonel John Roberts and Mr. C. J. Roberts, who were the owners, and the details of the conclusion of the transaction, that is, the exact way which it went through and reason for the organization of various companies. I may or may not have been, depending on whether I was available at the time. I was available at the time that particular question came up. I am not always in Chicago, but Mr. Thomas was my assistant to a large extent in connection with the deal. We have never sold any of the stock of Roberts & Company, to my knowl-

edge. We made no public offering of it." C. J. Roberts, called by plaintiff, testified that in 1929 he was president of Roberts & Oake; that he owned a large block of stock; that he was present at several meetings at the office of Roberts & Oake, Inc., at the stock yards in the year 1929, at which E. W. Thomas, vice president of A. C. Allyn & Company, was present; that he was present at a meeting of the directors of Roberts & Oake, Inc. in June or July, 1929, which was attended by Mr. Thomas; that Mr. Thomas said that he thought if the employees bought some of the stock it would stimulate their efforts in connection with their conduct of the business; that Mr. Thomas said "they would like to have the employees own some of the stock"; that witness said that during the World War he had "an experience of this kind and did not expect to go through it again"; that the experience arose out of the subscription of Liberty Bonds by employees of Roberts & Oake, wherein the employees failed to continue making their payments after the market price of the bonds had dropped, making it necessary for Roberts & Oake to pay for the bonds at par at a loss to them of seven or eight thousand dollars. Witness testified that "with that in mind, I am not going to force anybody to buy any of this stock"; that Thomas said that "if we got the keymen in he would be glad to talk with them in connection with the stock"; that the keymen were sent for and came in; that Thomas addressed the men; that witness failed to say anything due to the reason he had given; that Thomas told these keymen, including Mr. Hassey, that A. C. Allyn & Company would like to have them own some of this stock for the reasons given— the stock of Roberts & Company which was the holding company, and that with that in mind any stock they would subscribe to they would guaranty that if they bought it at $3 a share, that in case they bought the stock that they thought it was of good value; that the question arose as to what they would do with the stock

in case they were discharged or in case they died, whether their family would get it, and Mr. Thomas said they would pay $3 a share for every share of that stock sold or bought at that time, if they wanted to resign, whether they were discharged, or if they died; that he did not address the keymen; the address was made by Mr. Thomas. On cross-examination he identified the signature of plaintiff as secretary of Roberts & Oake, Inc. on the minutes of the meeting of June 13, 1933, an excerpt from which has been set out above. David R. Howland, called by plaintiff, testified that he also was president of Roberts & Oake during 1929; that in 1929 he became acquainted with Thomas, who was then vice president of A. C. Allyn & Company; that he was present at the time of the meeting in the summer of 1929. which was attended by Mr. Thomas and by the keymen including plaintiff; that ''Mr. Thomas addressed the employees and the directors, who were all employees but himself, and stated that A. C. Allyn who had gotten control of the business of Roberts & Oake, was anxious to have the keymen of the organization of Roberts & Oake stockholders in Roberts & Company, the new company who controlled Roberts & Oake, on the basis that they would be more interested in the welfare of the company. Mr. Thomas stated that the employees did not have to buy but they were anxious to see that those who were running the business have a share in the business; and offered Roberts & Company stock on the basis of $3.00 a share. After talking around on that subject, the first point that was raised and I think I was the one that raised it, if I remember, was what or how could we sell this stock once we owned it? And Mr. Thomas said that until a public market was made for the stock the stock would be bought back at $3.00 a share, if a man severed his relations with the company for any cause or was in a position where he needed the money badly.'' On cross-examination he testified that he did not know that defendant had contracted to buy some stock from C. J.

Roberts at a price of $3 a share. He further testified that Thomas was vice president and a director of Roberts & Oake, Inc. at the time of the meeting. Arnold Rose, called by plaintiff, testified that in 1929 he had charge of the purchases for Roberts & Oake; that he was present at the meeting; that "We were called in and addressed by Mr. Thomas. Mr. Thomas suggested that we purchase some of the stock in the new company. . . . I raised the question at the time as to what we could do with the stock in the event that we wanted to sell it. Mr. Thomas gave us assurance at that time that if we left the employ of the company that he would pay us just exactly what we paid for it." Plaintiff, J. P. Hassey, testified in his own behalf that in 1929 he was secretary of Roberts & Oake, the Illinois corporation, and also the corporation of the same name organized under the laws of Delaware, which succeeded to the assets and business of the Illinois corporation; that about June 10, 1929, he was present in the directors' room of Roberts & Oake at the Union Stock Yards; that present also were E. W. Thomas, vice president of A. C. Allyn & Company, C. J. Roberts and others; that "Mr. E. W. Thomas addressed the meeting, whom I knew to be a vice-president of A. C. Allyn & Company.

"He said, 'You know, there has been a change in the ownership of Roberts & Oake, but I want to assure you there will not be any change in its management. For the past good many years Miller & Hart, Roberts & Oake, and Roberts & Withington have all operated at a profit. A. C. Allyn & Company have now formed a parent company known as Roberts & Company, which will control those three companies by the ownership of its stock, common stock. Roberts & Company stock is priced as all common stock is priced at $3.00 a share. A. C. Allyn & Company is desirous of all the employees of Roberts & Oake that can do so to purchase this stock of Roberts & Company.' He further went on to say that inasmuch as these three companies had been suc-

cessful for a number of years in the past there wasn't any reason to believe but what their future would be successful. And he further stated that any employee buying this stock at $3.00 a share from A. C. Allyn & Company in the event of their leaving the service of the company at any time and for any reason whatsoever, he said, we will buy it back at $3.00 a share, provided, that if in the meantime A. C. Allyn & Company establish a market for this stock, then it will be up to the individual owner to either sell that stock on the market or hold it." The court then received in evidence a letter dated June 29, 1929, signed by Roberts & Oake, Inc., addressed to A. C. Allyn & Company, which forwarded 10 checks in the aggregate sum of $33,000, payable to A. C. Allyn & Company, to cover the subscription for 11,000 shares of Roberts & Company stock at $3 a share. Attached to the letter was also a sheet showing the subscribers. Plaintiff's stock certificate was received in evidence. It was also stipulated that no market was ever established for the stock. There was also received in evidence a letter dated October 16, 1937, wherein plaintiff demanded that defendant carry out the oral agreement which plaintiff alleged was entered into in June, 1929, to repay plaintiff at the rate of $3 per share for the stock he purchased, in the event he left the employ of Roberts & Oake. He also tendered the shares of stock. On cross-examination he testified that the checks for $33,000 forwarded to defendant in payment for the 11,000 shares, fell into three groups. The first group consisted of individual checks, which included plaintiff's check in the sum of $1,500. The second group consisted of employees who had a credit balance on the books of Roberts & Oake. The third group, aggregating $19,293.13, represented money which Roberts & Oake advanced to the employees to enable them to buy the stock; that the employees in effect borrowed the money from Roberts & Oake. Witness further testified that he continued to be a direc-

tor of Roberts & Oake, the Delaware corporation, until September, 1937; that he became a director of Roberts & Company around 1934, and continued to be a director in that corporation until September, 1937. The court also received in evidence a letter dated May 24, 1929, from A. C. Allyn & Company, by E. W. Thomas, vice president and treasurer, addressed to Mr. C. J. Roberts of Roberts & Oake, Inc., Chicago, and accepted by Mr. C. J. Roberts on the face thereof, which letter reads: "My dear Mr. Roberts:—

"In connection with the reorganization of Roberts & Oake, Inc., recently completed, there were delivered to you 73,157 shares of Roberts & Company (a Delaware Corporation) common stock. Roberts & Company has a capitalization of 750,000 shares of common stock authorized, of which 500,000 shares are now outstanding.

"Of the 73,157 shares of Roberts & Company Common stock delivered to you as above, you have agreed to hold 20,000 shares.

"We agree to buy from you and you agree to sell to us within one year from the date hereof, at $3 per share plus interest at the rate of 6% per annum to the date of payment, the remaining 53,157 shares of such Roberts & Company common stock, less such number of shares of such stock as you may dispose of within that period to members of the organization of Miller & Hart, Inc., Roberts & Oake, Inc. and Roberts & Withington, Inc. It is understood that you will not dispose of any such shares except to members of such organizations without our approval.

"We are to have the privilege of exercising our right to purchase all or any part of the stock covered by this agreement at the price specified, from time to time, within the period mentioned, upon reasonable notice to you of our intention so to do.

"Please indicate your acceptance and agreement to this understanding by signing below." Certain parts

of the bylaws of defendant corporation were received in evidence. These relate to the duties of the president and vice president. The following are excerpts from the bylaws: *"President:* . . . He may . . . without previous authority of the Board, make such contracts as the ordinary conduct of the Company's business requires. He shall have the usual powers and duties vested in the President of a corporation. . . . He may delegate any of his powers to a Vice-President of the Company. He shall at all times be subject to the Board of Directors.

*"Vice-President:* Each Vice-President shall have the same powers and duties as the President, in the event of the latter's absence or disability, and also such of said President's powers and duties as the President may from time to time delegate to him.'' Also received in evidence was the record of the defendant corporation showing the adoption, by the board of directors at·a meeting held on April 16, 1924, of the following resolution:

"*Whereas,* it is the unanimous opinion of the Board of Directors of A. C. Allyn & Company that it is unethical and not good business practice to buy or sell securities for guaranteed investment, we hereby instruct that the following letter be forwarded to all of the members of our organization:

" 'To the Members of the Organization of A. C. Allyn & Company:

" 'As we firmly believe trading in securities for guaranteed investment is unethical and detrimental to the best interests ·of the bond business, please be advised that the Board of Directors have passed a resolution today forbidding any of the members of our organization to purchase or sell securities that involve guaranteed investment.

" 'We also request that all of our officers and employees desist from writing any letters either for the firm or for their personal account, offering to sell or

purchase from anyone securities for guaranteed investment. We, as a firm, do not want to participate in any transaction of this kind in any way whatsoever.

" 'This is the second time we have cautioned the members of our organization about this, and as it is a vital matter, no violation will be tolerated, and we trust that we shall have your full co-operation.' " E. W. Thomas also testified in behalf of the defendant that in the investment securities business in Chicago, "guaranteed investment" meant the sale of securities to be repurchased at some future date at the price at which they were sold. He further testified that A. C. Allyn, president of defendant corporation, did not at any time tell witness that he could or might tell any one to whom the stock of Roberts & Company was being sold that A. C. Allyn & Company would repurchase such stock at the request of the purchasers. He further testified that there was no promise on behalf of defendant to repurchase the stock, but that he did make a statement that under certain conditions heretofore mentioned, the stock would be repurchased by Roberts & Oake. On cross-examination he testified that he was never actively in the meat packing business and that he became an officer in the packing companies because of the financing that was being arranged by A. C. Allyn & Company; also, that he did not show the keymen the letter of May 24, 1929. He further stated that an essential part of the investment business is the borrowing of substantially large sums from banks in order to swing deals; that when loans are made the banks require financial statements showing assets and liabilities; that when an investment house permits salesmen to make promises that the house will repurchase stock, then the house would have an indefinite contingent liability which would make it difficult to borrow because of the difficulty of making a financial statement. Witness further testified that at the time A. C. Allyn & Company bought the stock of Roberts & Company "we expected to keep the

bigger part of it. That is not the reason why we didn't make the public markets. The first reason that we did not attempt to make a public market was that before we could get down to it, October, 1929 happened, and it was impossible to market any stock''; that the second reason was that after the collapse of the market neither Miller & Hart nor Roberts & Oake had earnings to justify the marketing of the Roberts & Company stock. Plaintiff testified in rebuttal that prior to the directors' meeting of June, 1933, he called up A. C. Allyn & Company on the telephone with reference to the transaction for the purchase of stock; that he talked with Perry G. Anderson, whose voice he recognized; that the talk was around the early part of June, 1933; that witness told Anderson that ''one of our salesmen had left the employ of the company, and in accordance with the agreement under which he had purchased Roberts & Company stock, he wanted it bought back. Mr. Anderson agreed that it should be done. I said, 'Perry, it is all right to buy it back, but remember that A. C. Allyn & Company got the money for the stock, and they are the ones who should buy it back.' He said, 'Oh, Joe, it is only a small matter.' He said, 'Why not take it back and keep it in your own treasury?' and I said, 'I can't do that. I have not got the official say on that. I would have to take it up with some of the powers to be.' I said, 'Is that your official decision that we should carry that in our own treasury?' and he said, 'Yes.' '' The court on motion of plaintiff admitted into evidence a resolution adopted at the meeting of the board of directors of the defendant corporation on March 23, 1929, reading as follows:

''Be it resolved by the board of directors of A. C. Allyn and Company that the president or any vice-president or treasurer, or any assistant treasurer, or A. H. East, cashier, be and each of them hereby is authorized in the name and on behalf of this corporation, to sell, assign, or transfer any or all stock or bonds

or other securities that may now or hereafter be registered in the name of this corporation.''

Defendant calls attention to the fact that there is no dispute that on the day of the meeting E. W. Thomas was vice president of Roberts & Oake, as well as of A. C. Allyn & Company, and that a promise orally made by him might have been made as well in behalf of Roberts & Oake, Inc. as of the defendant. As plaintiff points out, although Thomas was an officer in Roberts & Oake, Inc., it was only ''because of this Allyn deal.'' He was a director, a vice president and a treasurer of A. C. Allyn & Company. That company was the initiator of the purchase of both Miller & Hart and Roberts & Oake, Inc. C. J. Roberts testified that Mr. Thomas told the keymen, including plaintiff, that A. C. Allyn & Company would like to have them own some of the stock of Roberts & Company, and with that in mind, any stock they would subscribe to ''they would guarantee that if they bought it at $3.00 a share, that in case they bought the stock they thought it was good value. . . . and Mr. Thomas said that they would pay $3.00 a share for every share of that stock that the employees sold or bought at that time, if they wanted to resign, whether they were discharged, or if they died.'' We are convinced that the evidence on the proposition as to whether the oral contract to repurchase was made in behalf of the defendant, A. C. Allyn & Company, or Roberts & Oake, Inc., presented a clear question of fact for the jury. If the jury believed the testimony favorable to the contention of plaintiff, it would be reasonable to infer from the conversations and circumstances that Mr. Thomas was speaking on behalf of A. C. Allyn & Company in announcing the repurchase arrangement.

The action of the board of directors of Roberts & Oake on June 13, 1933, participated in by plaintiff as a director, authorizing the purchase of the Roberts & Company stock owned by a salesman who left the employ of that corporation, was properly admitted as an

admission against interest. Plaintiff took the stand in rebuttal and offered an explanation of the action taken at the meeting of June 13, 1933. He told about a conversation with Perry G. Anderson, of A. C. Allyn & Co., in which he (witness) said, ''It is all right to buy it back but remember that A. C. Allyn & Company got the money for that stock and they are the ones that should buy it back.'' Plaintiff points out that there is no showing that the salesman who asked that his stock be repurchased was present at the meeting of the keymen, or that he bought his stock as a result of that meeting. In any event, the action of the board of directors taken on June 13, 1933, could only be considered in weighing the evidence.

Defendant also asserts that Mr. Thomas was without authority to make the promise in behalf of A. C. Allyn & Company, and contends that, in fact, the making of such contracts was specifically prohibited as shown by the resolution of the board of directors of defendant adopted April 16, 1924, at which meeting Mr. Thomas was present. Defendant also argues that no such authority was implied from Mr. Thomas' position as vice-president, nor did such office create such a presumption of authority, but if there were such presumption it would not constitute any *quantum* of evidence, and the affirmative evidence proved that such authority did not exist. Defendant also maintains that the alleged agreement was never ratified. We are of the opinion that the bylaws of defendant gave the president the power to make contracts in the ordinary course of its business without previous authority of the board of directors, and to delegate any of his powers to the vice president. The bylaws gave the vice president the same powers and duties as the president, in the event of the latter's absence or disability, and also such of the president's powers and duties as the president might from time to time delegate to him. The buying and selling of securities and the underwriting of issues of

securities, were all part of the business of defendant. It is clear that Mr. Thomas, as vice president, was acting for the president in the transaction involving the corporations we are discussing. The resolution of March 23, 1929, gave the vice president the authority to sell any securities or stock owned by defendant. This made Thomas a general agent to sell. In *Peoria Life Ins. Co. v. International Life & Annuity Co.*, 246 Ill. App. 38, it was held that "Where a corporation through its president sold notes and received the money paid therefor, it is in no position to question the authority of its president to sell the notes or the validity of his agreement to repurchase them, where the transaction appears to have been in furtherance of its corporate interests. *Flodin v. W. H. Lutes Co.*, 191 Ill. App. 195." Defendant places great reliance on the resolution of April 16, 1924, to sustain its position that there is no *quantum* of evidence establishing the authority of Thomas to make the agreement in behalf of defendant. There is a dispute between the parties, as to the meaning of the term "guaranteed investment." It is our view that the so-called "guaranteed investment" resolution was in the nature of special instructions to the officers and employees of defendant as to the manner in which they should discharge their duties. In *Green v. Ashland Sixty-third State Bank*, 346 Ill. 174, at p. 180, our Supreme Court said:

"The president of a corporation, by virtue of his office, is the business head of the corporation, and as a general rule any contract pertaining to corporate affairs within its general powers will, when executed by the president and in the absence of proof to the contrary, be presumed to have been executed by authority of the corporation as one of the powers incident to his office. (*Bloom v. Vehon Co.*, 341 Ill. 200.) The public is not bound to inquire into the special instructions which the officers or servants of a bank may have received as to the manner in which they shall dis-

charge their duties. This is a matter solely between the employer and the employed. The general rule is that the by-laws of a corporation are binding upon none but its members and officers. (*Ward v. Johnson,* 95 Ill. 215; *Munn v. Burch,* 25 id. 35.)'' There is also evidence that Mr. Thomas had apparent authority to make the alleged contract in behalf of defendant. Hence, we are of the opinion that under the record before us, the dispute as to whether Thomas had authority to make the contract involved the decision of a question of fact and not of law, and should have been left to the jury for determination.

The next point argued by defendant is that in any event there was no consideration for the alleged contract. Defendant states that the plaintiff did not purchase the stock from defendant; that plaintiff purchased the stock from C. J. Roberts, and that, therefore, there was no legal benefit received by defendant; that the stock simply passed through the name of defendant as the easiest way for C. J. Roberts to handle the mechanics of transferring some 11,000 shares of stock from his ownership to his employees, in varying amounts; that the consideration for the stock was paid in at $3 per share and passed on to Roberts at $3 per share. We agree with the contention of plaintiff that if the purchase of the stock was from C. J. Roberts, and plaintiff purchased it at the request of defendant, who was acting as a broker or underwriter, such purchase was a legal benefit to defendant, and was sufficient consideration to support the promise of defendant to repurchase. ''Wherever the pleas raise the question of no consideration moving from the appellee for the undertaking of appellant, it is enough to say that privity or consideration between a promisor and a third person, who is a beneficiary, need not exist to support the promise, provided there is a valuable consideration for the promise as between the principal parties to the undertaking. (*Dean v. Walker,* 107 Ill. 540; *Bay v.*

*Williams,* 112 id. 91.)'' Citing *Cobb v. Heron,* 180 Ill. 49.

Finally, defendant argues that the oral promise, if made, would be unenforcible because of section 4 of the statute of frauds (sec. 4, ch. 121½, Ill. Rev. Stat. 1939 [Jones Ill. Stats. Ann. 121.08]). It is, of course, conceded that the alleged oral agreement was for the resale by plaintiff of shares of corporate stock of the value of $500 and upwards. Plaintiff, however, replies by contending that there was a part performance sufficient to take the case out of the statute. Defendant insists, however, that there was no part performance since there was no contract for the sale of the stock from defendant to plaintiff. Defendant states that where the alleged promisor is not selling stock which belongs to it, but to another, it is uniformly held that there are two contracts, and not one, and that the performance of the first contract is not a part performance of the second, and that, therefore, the statute of frauds is applicable to defeat any action upon the oral promise of alleged repurchase. In support of this proposition defendant cites *Thomas v. Peoples' Gas & Electric Co.,* 220 Iowa 850, 263 N. W. 499; *Gainsburg v. Bachrack,* 241 App. Div. 28, 270 N. Y. S. 727; *Wood v. Fairbanks,* 244 Mass. 10, 137 N. E. 924; *Korrer v. Madden,* (152 Wis. 646) 140 N. W. 325; *Becker v. Kreul,* 173 Wis. 273, 181 N. W. 211. Defendant asserts that no benefit accrued to Allyn & Company by reason of the transaction since the effect of the sales to employees was simply to substitute them instead of A. C. Allyn & Company, as purchaser, from C. J. Roberts, to the extent of the 11,000 shares which the employees took. Plaintiff does not challenge the proposition of law advanced by defendant. Plaintiff asserts however, that the evidence shows that plaintiff paid the purchase price for the stock to A. C. Allyn & Company; that A. C. Allyn & Company accepted the purchase price and that certificate No. 100 for 1,085 shares which was issued to

plaintiff, originated from certificate No. 83, which was issued to A. C. Allyn & Company for 60,000 shares, that the stock was purchased from A. C. Allyn & Company, and that the promise to repurchase was made simultaneously with the sale. We are of the opinion that there is evidence in the record from which the jury could find that the sale and the repurchase agreement were made by A. C. Allyn & Company, and that in fact the sale and repurchase agreement was one transaction. It will be recalled that the employees inquired as to what would happen in case of death, or in case they ceased to be employees. A reasonable inference is that the contract to purchase the stock would not have been entered into by the employees without the repurchase promise being made an integral part of the deal. We are, therefore, of the opinion that the court did not have a right to decide, as a matter of law, that the action was barred by section 4 of the statute of frauds.

For the reasons stated, the judgment of the municipal court of Chicago is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

DENIS E. SULLIVAN, P. J., and HEBEL, J., concur.